Filed 6/24/22 Nunez v. Nicholson CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| HENRY D. NUNEZ et al.,<br><br>    Plaintiffs and Appellants,<br><br>         v.<br><br>DARYL C. NICHOLSON, Individually and as Trustee, etc., et al.,<br><br>    Defendants and Respondents. | F078044<br><br>(Super. Ct. No. MCV058367)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Madera County. James E. Oakley, Judge.

Law Office of Henry Nunez, Henry D. Nunez and Alaina N. Ybarra; Daniel L. Harralson Law Office and Daniel L. Harralson, for Plaintiffs and Appellants.

Hanson Bridgett, Gary A. Watt, John T. Cu, Patrick Burns; Fowler Helsel Vogt, Jason A. Helsel and Mark Vogt, for Defendant and Respondent Daryl C. Nicholson, Individually and as Trustee of the Nicholson Trust.

Ravinderjit Singh Gill, in pro. per. for Defendants and Respondents Ravinderjit Singh Gill et al.

-ooOoo-

This case arose from the sale of a complex containing a gas station, carwash, mini mart, and taqueria through nonjudicial foreclosure proceedings. The borrowers brought this action against the buyers of the property, asserting that the equipment associated with the property was personal property and did not pass to the buyers in the foreclosure sale.

The borrowers litigated the case for years on theories aimed at recovering personal property. The matter proceeded to bench trial five years after the inception of the case. During trial, the borrowers sought to add causes of action aimed at invalidating the transfer of title to the real property in the foreclosure sale. The trial court denied the borrowers' request to add wrongful foreclosure and quiet-title-to-real-property claims to the operative complaint. The grounds for denial were unreasonable delay and the fact that discovery was conducted in relation to disputed personal property interests only.

After trial, the trial court concluded the subject equipment was real property or "fixtures" and ownership thereof passed with the title to the real property to the buyers in the foreclosure sale. The plaintiff borrowers appeal the trial court's denial of their motion to amend the relevant complaint to add a quiet-title-to-real-property claim as well as the trial court's determination that ownership of the equipment passed with the title to the real property in the foreclosure sale. We affirm the trial court in both respects.

## FACTS

This case was brought by plaintiffs and appellants, Henry D. Nunez and his wife, Joy T. Nunez; La Plaza Mini Mart, Inc., a California corporation of which Henry D. Nunez was President; and Joy T. Nunez as Trustee of the Joy T. Nunez, Physical Therapy, Inc., Employee Pension Plan (Nunez plaintiffs). The defendants were Daryl C. Nicholson; Daryl C. Nicholson as Trustee of the Nicholson Trust; Ravinderjit Singh Gill; H. J. & J. Gill, LLC; Gill Investments, Inc.; Tahoe Equities, Inc. (Tahoe Equities); and

2.

Richard Warren Russell, President of Tahoe Equities.[1]  Tahoe Equities and Richard Warren Russell did not appear at the underlying trial, and defaults were entered against them.  Wells Fargo Bank (Wells Fargo) was also a defendant in the case; the action was stayed as to Wells Fargo because the dispute between the plaintiffs and Wells Fargo was referred for arbitration.  The Nicholson defendants filed a cross-complaint; we need not address the cross-complaint as the instant appeal does not encompass the cross-complaint.  The Nicholson defendants and Gill defendants are the respondents on appeal.

This case stems from the sale, in a nonjudicial foreclosure proceeding, of La Plaza gas-station-mini mart-taqueria-carwash complex, located at 900 South Gateway Drive in Madera (collectively, La Plaza complex or La Plaza property or Gateway Property or the property).  The La Plaza complex was a business created by Henry Nunez (Nunez), who operated it through La Plaza Mini Mart, Inc. (La Plaza), until he lost it to foreclosure.[2]  The matter proceeded to bench trial in the Madera County Superior Court, before Judge James Oakley.

## A.    *Nunez Obtained Business Loans to Create La Plaza as a "One Stop Shop"*

At trial, Nunez explained how he "gained the property that the La Plaza Mini Mart gas station and carwash is located on."  He noted he "acquired the property back in the '80s at least in a percentage interest that amounted up to 50 percent," and then attained full ownership in 2002.  When Nunez acquired the Gateway Property, he held it in his

---

[1]    We will refer to Daryl C. Nicholson, an individual, and Daryl C. Nicholson, Trustee of the Nicholson Trust, collectively, as Nicholson or the Nicholson defendants. We will refer to Ravinderjit Singh Gill, H. J. & J. Gill, LLC, and Gill Investments, Inc., collectively, as Gill or the Gill defendants.

[2]    The second amended complaint, which was the operative complaint when the trial in this matter commenced, described La Plaza Mini Mart, Inc. as follows:  "[A] California corporation closely held and owned by Plaintiff Henry D. Nunez, who operated the business known as La Plaza Mini Mart." (Unnecessary capitalization omitted.)

own name initially. Nunez testified: "I had subsequently after that time period put it in the name of Henry and Joy Nunez. Then after that[, in 2004,] I transferred the property into the name of La Plaza Mini Mart, Inc." Nunez added: "We deeded it back in 2008 back [on] March 21st of 2008 and that was because I was in the process of building a gas station, mini mart, car wash, taqueria and we deeded the land back into our individual name[s] because the corporation by itself could not get financing."

Nunez envisioned redeveloping the land with multiple "profit centers," providing a "one stop shop" for customers. Preexisting buildings on the property were torn down, while the one remaining building was remodeled into a mini mart with a taqueria inside. Nunez added a gas station and carwash to the property, with the goal of creating multiple, interconnected "profit centers" and enhancing the value of the property. Nunez envisioned the La Plaza complex as a one stop shop, where customers could shop, eat, get gas, and wash their cars, thereby generating multiple revenue streams for the complex. Nunez intended to create a durable, long-term business and legacy investment that he could pass onto his children. He explained: "I developed it in an effort to create a business for my daughter and son is why I developed it."

In November 2007, La Plaza Mini Mart, Inc. had entered into a lease with Puget Sound Leasing Co., Inc., for equipment installed on the property to operate the carwash. Later, the lease was assigned to Wells Fargo Equipment Finance, Inc. (WFEF).

In June 2008, Nunez and Joy Nunez obtained collateralized business loans from Wells Fargo Bank in their own names, by refinancing the La Plaza property to acquire more capital to develop the business and the property. As relevant here, in June 2008, a promissory note was executed by Wells Fargo (as the lender) and Nunez and Joy Nunez (as the borrowers), for the principal amount of $1,230,000, plus interest. Wells Fargo secured the $1,230,000 loan through a deed of trust. Wells Fargo also secured the $1,230,000 loan amount through commercial security agreements with Henry Nunez and

4.

Joy Nunez, as well as with La Plaza. The loans were secured through two UCC-1 filings, based on each of the security agreements.

Pursuant to the terms of the security agreements, the two UCC-1 filings applied to the following collateral connected to the Gateway Property: "All Inventory, Chattel[,] Paper, Accounts, Equipment[,] and General Intangibles; whether any of the foregoing is owned now or acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing; all proceeds relating to any of the foregoing (including insurance, general intangibles and other accounts proceeds). Plus the real property legal description on the addendum form."

The equipment at the La Plaza complex included underground fuel tanks, fuel pumps or dispensers, a large canopy protecting the fuel pumps and customers from the sun and rain, multiple large and heavy-duty signs, a rollover carwash, underground water tanks, soap dispensers, water pumps, hoses, a vacuum system, a water reclaim system, a Unitek Teller for payment, cash registers, shelves, kitchen appliances, and cooking equipment.

The promissory note for the $1,230,000 loan was signed by Nunez and Joy Nunez in their individual capacities; furthermore, La Plaza Mini Mart, Inc., and two other corporations associated with Nunez (H & N Accountancy Corporation (H & N) and Cypress Estates, Inc. (Cypress Estates), guaranteed the loan.[3]

**B.** **The Loans Became Delinquent and, Thereafter, Wells Fargo's Agent Recorded a Notice of Default and a Notice of Trustee's Sale**

Nunez and Joy Nunez had become delinquent on the above-mentioned loan by the spring of 2010. In April 2010, Wells Fargo, through its agent WT Capital Lender

---

[3] H & N and Cypress Estates were named as cross-defendants in the cross-complaint filed by the Nicholson defendants.

Services (WT Capital), recorded a notice of default and election to sell under deed of trust and security agreement (notice of default) in the official records of Madera County. The Notice of Default indicated that Wells Fargo, the beneficiary, would conduct a unified sale[4] of all the real and personal property securing the loan, including the collateral equipment described in the two relevant UCC-1 financing statements.[5]

In June 2010, Wells Fargo signed a substitution of trustee document, substituting WT Capital as the trustee, in connection with its secured loans; the substitution of trustee was promptly recorded.

Thereafter, in July 2010, WT Capital, as trustee, recorded a Notice of Unified Trustee's Sale (Notice of Sale), setting a foreclosure sale date of August 5, 2010. The Notice of Sale stated that Nunez and Joy Nunez were in default on the loans, and the trustee would sell at public auction, to the highest bidder, the title to the Deed of Trust for the La Plaza complex. It also provided notice of the fact that the collateral equipment encompassed by the two relevant UCC-1 financing statements was included in the sale.

The Notice of Sale was published in the Madera Tribune on July 15, 22, and 29, 2010. The published notice (and related proof of publication) stated that Wells Fargo had elected to sell the real property identified in the deed of trust as well as personal property and fixtures identified in the two UCC-1 financing statements filed with the Secretary of State.

---

[4]     Testimony at trial revealed that a "unified sale" is one in which "the collateral being sold include[s] both real property [and] personal property collateral."

[5]     The Notice of Default further referenced the security agreement between Wells Fargo and Henry and Joy Nunez; it did not reference the security agreement between Wells Fargo and La Plaza as this document was evidently not in the file provided to WT Capital.

6.

*C.*     *Nunez Attempted to Sell the La Plaza Complex Himself; and the Trustee's Sale was Postponed Four Times*

Prior to the Trustee's Sale, Nunez began marketing the La Plaza complex to third parties, in an effort to raise the amount owed on the loan. Nunez offered the property for sale, including all the fixtures, equipment, and personal property thereon.[6]  Nunez testified he informed Wells Fargo he was trying to sell the property and requested Wells Fargo to let potential buyers "assume the loan and/or give them a new loan."

In July 2010, Nunez asked Wells Fargo to postpone the August 5, 2010 trustee's sale, which request was approved, and the sale postponed to September 7, 2010. Wells Fargo instructed WT Capital to postpone the sale three more times. WT Capital's senior vice-president, Debra Francesconi, testified that the sale was postponed from September 7, 2010, to November 15, 2010, from November 15, 2010 to December 15, 2010, and from December 15, 2010 to January 12, 2011. WT Capital did not publish and record a new notice of trustee sale "[b]ecause the postponements were publicly announced." The postponements were all announced publicly in accordance with WT Capital's policy of contacting and instructing the auctioneer to publicly announce the postponement at the time and place designated for the sale. Francesconi also noted that WT Capital took instructions from Wells Fargo up to January 11, 2011. During the period leading up to the sale, Nunez continued to try to arrange financing to facilitate the sale of the property to third-party buyers (he was himself negotiating with, and trying to set up financing for, potential third-party buyers).

---

[6]     On October 1, 2010, Nunez faxed to Wells Fargo personnel an offer letter provided to potential buyers. The offer letter for the sale of "[s]tore, [r]estaurant, gas station, car wash, inventory, real property," dated September 30, 2010, stated: "Included in the purchase price is the land, the buildings, the store and fuel inventories, all personal property, the pumps, cash registers, accounting systems, computers, restaurant inventory and … all property located on the property, including furniture and fixtures."

In late December 2010, as the final sale date approached, Wells Fargo informed Nunez that it would not agree to financing options that Nunez was trying to arrange for potential third-party buyers. On December 27, 2010, Nunez wrote an email to Wells Fargo personnel in which he noted, "I am perplexed as to why Wells Fargo will not allow a qualified Buyer to assume the loan and/or obtain a new loan in order to cure the defaults and pay off the loan." By January 4, 2011, Nunez became aware that the third party he had been negotiating with regarding a potential sale of the property would not purchase the property. Nunez testified he believed that defendants Wells Fargo and Tahoe Equities interfered with an agreement he had made with the third-party buyer to purchase the property contingent on arranging the requisite financing.

With the foreclosure sale imminent, Nunez concluded there were "errors in the trustee sale" and decided to attend and videotape the actual public trustee's sale proceeding. Nunez did not inform Wells Fargo or WC Capital, the trustee, of any potential irregularities about which he had concerns, or object to the sale. Nunez testified: "At the time of the sale, I didn't say a word. We were just filming it and seeing what's going to go."

**D.** *Wells Fargo Assigned the Promissory Note and Beneficial Interest in the Deed of Trust to Tahoe Equities, Which Assigned the Note and Beneficial Interest in the Deed of Trust to the Nicholson Defendants; the Nicholson Defendants Purchased the Gateway Property at the Trustee's Sale and Subsequently Sold it to Gill*

On January 5, 2011, Wells Fargo assigned the promissory note and beneficial interest in the deed of trust related to the loans on which Nunez and Joy Nunez had defaulted, to Tahoe Equities. On January 10, 2011, Tahoe Equities assigned the promissory note and beneficial interest in the deed of trust to the Nicholson defendants.[7]

---

[7] The Nunez plaintiffs state in their brief that the UCC-1 financing statements recorded by Wells Fargo to secure the loan were not assigned to the Nicholson

On January 12, 2011, a trustee's sale was conducted, and the Gateway Property was sold to the Nicholson Trust for the sum of $1,200,000, by means of a credit bid. Nunez, his attorney, and a private investigator attended and videotaped the sale. Nunez also took notes.

On January 13, 2011, WT Capital, on behalf of Daryl Nicholson as trustee of the Nicholson Trust, recorded the Trustee's Deed Upon Sale. The deed was vested to Daryl Nicholson, trustee of the Nicholson Trust.

In April 2011, a second sale for the personal property was conducted out of "an abundance of caution," because the trustee discovered the auctioneer at the initial sale did not specifically announce that personal property was included in the sale. Daryl Nicholson purchased the property on behalf of the Nicholson Trust, at the second sale, for $1000.

Approximately one year later, on March 24, 2012, Nicholson sold the Gateway Property to Gill for a purchase price of $1,300,000. Gill understood his purchase to encompass the equipment for the gas station, carwash, and mini mart.

### E. Following the January 12, 2011 Trustee's Sale of the Gateway Property, Nicholson Agreed to Waive the Deficiency Balance in Exchange for Surrender of Possession by Nunez

Following the foreclosure of the Gateway Property and the trustee's sale, a deficiency balance to the tune of approximately $188,671 remained owing on the operative loan (this was significant because a number of corporate entities associated with Nunez had guaranteed the loan). As noted in the trial court's post-trial statement of decision, "On January 14, 2011, Darryl Nicholson on behalf of the Nicholson Trust, and Henry Nunez on behalf of the Plaintiffs, entered into a written agreement whereby the

---

defendants. However, the Nunez plaintiffs have not provided any citation to the record to support this statement.

Nicholson Trust agreed to waive the deficiency balance in exchange for the smooth transition of possession of the Property by the Plaintiffs to the Nicholson Trust."

An email sent by Daryl Nicholson in connection with his offer to waive the deficiency balance in exchange for the prompt transfer of possession by Nunez, specifically noted that the "foreclosure included all inventory equipment, records and other items, as outlined in the Secured Party Bill of Sale." Nunez prepared an acceptance letter regarding Daryl Nicholson's offer to waive the deficiency balance; Daryl Nicholson signed the letter. The acceptance letter noted that "[t]he waiver of the deficiency is in consideration for the smooth transition of possession of the property pursuant to Trustee Deed and secured party bill of sale," and further that "[a]ny dispute as to title of any kind is the responsibility of Nicholson." Pursuant to the agreement, the deficiency balance of over $188,000 was waived by the Nicholson Trust, and Nunez provided, on January 15, 2011, the keys to the Gateway Property to Daryl Nicholson.

Thereafter, with the deficiency balance resolved and the Nunez entities that had guaranteed it absolved of liability for it, the Nunez plaintiffs commenced the instant lawsuit asserting ownership of the equipment at the La Plaza property, and seeking return of the equipment as well as over $600,000 in damages for conversion and use of the equipment. Daryl Nicholson testified at trial: "I have never bought a note before in my life," and "I've never been sued over a note I bought."[8] He explained: "I believed that I was trading the deficiency of almost $200,000 for the keys, and [the acceptance letter prepared by Nunez] was at the last minute, and I didn't recognize the legality of the writings. Mr. Nunez did not tell me anything about this. He just said, 'I need this signed; I'll give you the keys.' " Daryl Nicholson noted that he believed he already had title over

---

[8]     Daryl Nicholson testified at trial that he was a "business owner" in the fields of building, contracting, and developing property. He also owned "[m]ini-storage businesses."

everything "by way of foreclosure from WT Capital." He clarified the bill of sale was for real and personal property and he understood it to include "everything on the property." Daryl Nicholson further explained that he had a conversation with Nunez to the effect that Daryl Nicholson "would waive the deficiency in exchange for an orderly transition of the property in an expedient fashion."

Nunez did not assert ownership over the equipment on the property at that time; he did not remove equipment from the property (prior to handing over the keys), nor did he indicate he would remove equipment from the property. Nunez was asked at trial: "[A]fter [the deficiency balance was waived] and you hand[ed] over the keys to Mr. Nicholson, did you ever take an opportunity before the lawsuit to come tell Daryl Nicholson that you are going to come pull out the gas equipment out of the ground and off the walls?" Nunez responded in the negative. Nunez was then asked: "Did you ever get a crew together and get an estimate of what it was going to take to remove gas from underground and hoses and wires and all that, did you ever get that done?" Nunez once again responded in the negative.

As for the automatic, rollover carwash equipment at the La Plaza complex, this was leased from Puget Sound, which had subsequently assigned the lease to WFEF. Eventually, after the Gateway Property was sold in the trustee's sale, a collection agency contacted Nunez in April 2011, seeking the full amount due on the lease. Nunez negotiated to buy the carwash equipment through the Joy T. Nunez, Physical Therapy, Inc. Money Purchase Pension Plan Trust for a lesser sum (WFEF assigned the lease to the Joy T. Nunez, Physical Therapy Trust as part of the sale). In February 2016, the carwash equipment on the Gateway Property was vandalized and replaced.

11.

**A.      *With the Issue of the Deficiency Balance Resolved in Their Favor, the Nunez Plaintiffs Filed the Instant Lawsuit Claiming Ownership of Equipment at the La Plaza Complex***

Plaintiffs Nunez and Joy Nunez, and the other associated entities, filed this action in the Madera County Superior Court on December 6, 2011. They filed a first amended complaint on February 27, 2012. As for when Daryl Nicholson was served, the court's file reflected only that Daryl Nicholson was served with the first amended complaint on June 14, 2012, *after* the property had been resold to the Gill defendants on March 24, 2012. A second amended complaint was filed in the matter on September 24, 2012.

The second amended complaint, which was the operative pleading when trial began, named as defendants, Tahoe Equities, Richard Russell (alleged owner of Tahoe Equities) and David Meeks (alleged partner of Russell and/or Tahoe Equities), Wells Fargo Bank, Daryl Nicholson (both individually and as trustee of the Nicholson Trust), as well as Doe defendants. The second amended complaint encompassed 11 causes of action. The first cause of action, inducing breach of contract, was alleged against all defendants. The second cause of action, intentional interference with contractual relations, was alleged against all defendants. The third cause of action, intentional interference with prospective economic advantage, was alleged against all defendants. The fourth cause of action, negligent interference with prospective economic advantage, was alleged against all defendants.

The fifth and sixth causes of action, breach of fiduciary duty and invasion of privacy, respectively, were alleged against Wells Fargo Bank. The seventh cause of action, aiding and abetting the conduct encompassed in the first, second, third, and fourth causes of action, was alleged against all defendants. The eighth cause of action, conversion of business equipment, supplies and other personal property located on the Gateway Property, was alleged against Daryl Nicholson and Doe defendants. The ninth

cause of action, quiet title to business equipment, supplies, and other personal property located on the Gateway Property, was alleged against Daryl Nicholson and Doe defendants. The tenth cause of action, recovering possession of equipment, supplies, and other personal property located on the Gateway Property, was alleged against Daryl Nicholson and Doe defendants (although not explicitly so). The eleventh cause of action, unfair business practices, was alleged against all defendants.

As to the claims for inducing breach of contract, intentional interference with contractual relations, intentional interference with prospective economic advantage, breach of fiduciary duty, invasion of privacy, aiding and abetting, and unfair business practices, the second amended complaint sought economic damages above $1.6 million, noneconomic damages according to proof, and punitive damages according to proof. With respect to the claim for negligent interference with prospective economic advantage, the second amended complaint sought economic damages above $1.6 million and noneconomic damages according to proof.

As for the conversion and quiet-title-to-business-equipment-etc. claims against Daryl Nicholson, the second amended complaint sought damages above $600,000, the immediate return of personal property located on the Gateway Property, punitive damages according to proof, and quiet title to the personal property located on the Gateway Property. Regarding the claim to recover possession of equipment, supplies, and other personal property located on the Gateway Property, the second amended complaint sought, (1) "economic damages in excess of the amount of $600,000.00, for the wrongful detention and use of the plaintiffs' business equipment and personal property"; and (2) "the reasonable daily rental value, according to proof, for the wrongful detention and use of the plaintiffs' business equipment and personal property."

The Nunez plaintiffs subsequently named the Gill defendants in place of the Doe defendants included in the second amended complaint.

13.

Significantly, the Nunez plaintiffs did not assert a wrongful foreclosure claim or any other real property claim, in the second amended complaint.

In February 2013, Daryl Nicholson, as an individual and as trustee of the Nicholson Trust, filed a cross-complaint against Nunez's H&N Accountancy Corporation and Cypress Estates, Inc., alleging causes of action for breach of written guarantee. The cross-complaint against Cypress Estates was dismissed prior to the start of trial. The cross-complaint sought relief for the deficiency balance that was waived by Daryl Nicholson, on the theory that he only waived it based on the understanding that the equipment at the La Plaza complex was included in the January 12, 2011 trustee's sale, and therefore, to the extent the Nunez plaintiffs owned the equipment, the waiver of the deficiency was based upon a mutual mistake.

**B.      *Trial Court Granted Summary Adjudication to the Nicholson Defendants and the Gill Defendants on Several Tort Claims Included in the Second Amended Complaint***

On December 22, 2015, the trial court granted summary adjudication to the Nicholson defendants and the Gill defendants as to the causes of action for inducing breach of contract, intentional interference with contractual relations, intentional interference with prospective economic advantage, negligent interference with prospective economic advantage, and aiding and abetting. The only claims remaining against the Nicholson defendants and Gill defendants were for conversion, quiet title to personal property, recovery of personal property, and unfair business practices.

**C.      *The Nunez Plaintiffs Proceeded to Trial Against the Nicholson Defendants and the Gill Defendants on November 28, 2016 (five years after the original complaint was filed on December 6, 2011); the Trial Court Denied the Nunez Plaintiffs' Repeated Requests, During the Trial, for Leave to Amend the Relevant Complaint to Add Real Property Claims as to These Defendants***

The Honorable James E. Oakley presided over an 11-day bench trial on the plaintiffs' remaining claims and the Nicholson defendants' cross-complaint against H &

14.

N. Nunez, an attorney, represented himself, La Plaza Mini Mart, Inc., and H & N throughout the trial court proceedings, including the trial (Daniel L. Harralson was co-counsel). Trial commenced on November 28, 2016, but it was not continuous; rather, it proceeded in intervals (mostly on account of Nunez's co-counsel's scheduling difficulties). Thus, although trial commenced on November 28, 2016, closing arguments were not presented until February 9, 2018.

The Nunez plaintiffs called several witnesses, including Nunez, Daryl Nicholson, Ravinderjit Singh Gill, and WT Capital's Vice-President Debra Francesconi.[9]

On June 30, 2017, the day the Nunez plaintiffs rested their case, they filed a motion for leave to file a third amended complaint to conform claims to proof, seeking to add causes of action for replevin and wrongful foreclosure. The Nunez plaintiffs' counsel, Daniel Harralson, raised the issue at trial that same day, i.e., June 30, 2017, during his direct examination of Daryl Nicholson, who was called as a witness in the Nunez plaintiffs' case in chief. Mr. Harralson observed: "I don't know if it's been filed yet, but we have a Motion to Amend the complaint based upon proof, and we would like to present that at this time so that I can then question [Daryl Nicholson] on those issues as well." The court heard argument on the spot. Counsel for the Nicholson defendants noted: "[W]e sort of anticipated this type of move, and I – I'm sort of prepared to address it."

Counsel for the Nicholson defendants pointed out, with reference to the record, that the Nunez plaintiffs' request to amend reflected an unreasonable delay as the Nunez plaintiffs had been aware of the underlying facts for several years but had failed to add the claims in a timely manner. Counsel noted the Nunez plaintiffs had represented as

---

[9] Some documents in the record refer to Debra Francesconi as Debra Berg. She testified at trial that she changed her name in the interval between the trustee's sale and the trial. The trial court noted the change for the record.

early as October 2015 that they would move to add a claim for wrongful foreclosure but failed timely to do so. The Nunez plaintiffs argued they had not "appreciated" the facts until after Debra Francesconi of WT Capital testified at trial. The court expressed skepticism that "appreciating the facts really is the standard" as opposed to "knowledge of the facts," and noted Francesconi was "subject to deposition all along." The court orally denied the motion without prejudice, noting the parties would thereby have an "opportunity to at least address this in a more methodical manner."[10] Later that day, the Nunez plaintiffs rested their case.

Two months later, on August 17, 2017, *after having rested*, the Nunez plaintiffs brought another motion to amend, to add claims for replevin, trespass to chattels, and quiet title to *real property*. Unlike the previous motion to amend, this motion did not seek to add a claim for wrongful foreclosure. Nunez's supporting declaration asserted that the Nunez plaintiffs had recently "realized" the applicability of the quiet-title-to-real-property claim while researching another issue in the case.

The Nicholson defendants filed an opposition, stating that causes of action are based on facts and the Nunez plaintiffs had knowledge of the facts underlying the new claims for years. As to the quiet title to real property claim, the Nicholson defendants argued they would be prejudiced by having to defend against a claim based on a new theory (i.e., a claim involving alleged *real property* interests) added in the middle of trial, given that discovery had been conducted in relation to claims based on different theories (i.e., claims alleging damage to *personal property* interests). In this regard, at the hearing on the motion to amend on September 11, 2017, counsel for the Nicholson defendants

---

**10**    The court observed: "My understanding is that [counsel for the Nicholson defendants] are just hearing about [this motion] for the first time [on June 30, 2017], even though we were all here a week ago and all these declarations [attached to the Nunez plaintiffs' motion] are dated on [June 23, 2017]. They could at least have been notified that they should prepare to address this issue."

16.

argued: "We tried the case on a personal property theory and this appears to be an effort to bootleg in a different remedy, potentially more expansive remedy and a different theory at the 11th hour mid trial and it should properly be denied."

The trial court granted the Nunez plaintiffs' motion to amend with respect to the replevin and trespass to chattels causes of action but denied it with respect to the claim seeking quiet title to real property. In denying the motion to amend as to the claim for quiet title to real property, the court stated from the bench: "The Court [will] deny the motion with respect to the [claim for] quiet title to real property. The Court does believe that it is untimely. The facts at least that would have been the basis of such a motion or amended complaint were known literally years before now and certainly the motion should have been brought prior to trial. And it would certainly change the nature of the evidence to be presented at trial by the parties and, as pointed out by Nicholson, it certainly would have changed the entire direction of discovery that may have occurred."

The Nunez defendants filed the third amended complaint on October 10, 2017. On the next trial day, November 20, 2017, the Nicholson and Gill defendants rested their cases without calling any witnesses. Counsel for the Nicholson defendants observed: "Your Honor, given the way that the trial went with a lot of neutral witnesses being called in plaintiffs' case in chief, the defense does not have any witnesses." The trial court stated: "[N]ext week would be the one year anniversary [from opening statements]. At least we got the evidence in within a year." Subsequently, the parties filed closing briefs and, thereafter, on February 9, 2018, the court heard closing arguments.

**D.** ***The Trial Court Ruled in Favor of the Nicholson and Gill Defendants, Denying Relief to the Nunez Plaintiffs***

On April 30, 2018, the trial court issued a tentative decision (for a statement of decision) pursuant to Code of Civil Procedure section 632 and California Rules of Court, rule 3.1590. In its tentative decision, the court ruled in favor of the Nicholson and Gill

17.

defendants on all the claims raised by the Nunez plaintiffs against them.[11]  The Nunez plaintiffs filed objections to the tentative decision.

The trial court issued its final statement of decision on June 25, 2018, ruling in favor of the Nicholson defendants and Gill defendants and denying relief on the Nunez plaintiffs' claims against them.  The trial court found that the Nunez plaintiffs had failed to show an ownership interest in the La Plaza equipment for two independent reasons.  First, the court found the subject equipment constituted real property or "fixtures."  The court stated: "[T]he items of property which are the subject of each of the causes of action alleged in the Third Amended Complaint are fixtures appurtenant to the Property, title to which passed to the Nicholson Defendants upon the foreclosure sale of the Property.  Thereafter, title to the fixtures passed to the Gill Defendants upon the subsequent sale of the real property from the Nicholson Defendants to the Gill Defendants."  Second, and in the alternative, the court found that the Nicholson defendants and Gill defendants took title to any personal property at the Gateway Property as bona fide purchasers for value (BFPs) under Civil Code section 2924 et seq.

The court rejected the Nunez plaintiffs' objections to the tentative decision.  The Nunez plaintiffs had objected, inter alia, that the court had not considered and ruled on their claims against Tahoe Equities, Richard Russell, and Wells Fargo Bank.  As to Wells Fargo Bank, the Nunez plaintiffs acknowledged that the court had granted Wells Fargo's motion to proceed with arbitration.  As to Tahoe Equities and Richard Russell, the Nunez plaintiffs contended: "The Plaintiffs presented evidence during the trial on the merits of the causes of action [i.e., inducing breach of contract, intentional interference with contractual relations, intentional interference with prospective economic advantage, and

---

[11]   The trial court also ruled on the Nicholson defendants' cross-complaint, finding in favor of H & N.  The Nicholson defendants did not file objections to the tentative decision and did not appeal the trial court's ruling on the cross-complaint.

18.

aiding and abetting] and damages to be awarded against Tahoe Equities, Inc. and Richard Russell. Plaintiffs believe that the Court's failure to address these two parties is a mere oversight and that the Court's decision is pending. The Plaintiffs are requesting clarification on these matters and for damages to be awarded pursuant to a judgment against Tahoe Equities, Inc. and Richard Russell in favor of Plaintiffs."

The plaintiffs had also objected to the court's tentative decision in favor of the Nicholson and Gill defendants on grounds "the car wash equipment was leased from Puget Sound and thereafter Wells Fargo Equipment Finance." The plaintiffs argued: "[T]he court's finding that the car wash equipment was included in the sale or that it became a fixture is inconsistent with the acts of the third party owner, WFEF." In addition, the plaintiffs had objected to the trial court's finding that the Nicholson defendants and Gill defendants were BFPs, contending that a number of alleged defects in the trustee's sale precluded such status.

In rejecting these objections, the trial court clarified: (1) the judgment against the other defendants, including Tahoe Equities, Russell, and Wells Fargo, would be deferred pending further proceedings; (2) the third party lease on the carwash equipment did not affect the objective status of the La Plaza carwash equipment as real property; and (3) there were no defects in the trustee's sale sufficient to preclude the status of the Nicholson and Gill defendants as BFPs.

The trial court entered judgment in favor of the Nicholson defendants and Gill defendants on the third amended complaint. The Nunez plaintiffs filed a notice of appeal as to the judgment in favor of Nicholson and Gill; the notice specified it "shall not apply" to defendants Tahoe Equities, Russell, and Wells Fargo.

19.

*E.      Trial Court Subsequently Granted Judgment Against Defaulted Defendants on Claims Against Them*

Tahoe Equities and Richard Warren Russell did not appear at the trial, and defaults were entered against them.[12] Prior to trial, Nicholson moved in limine to exclude evidence the Nunez plaintiffs sought to introduce as ostensible admissions by Tahoe Equities and Russell. In adjudicating motions in limine, the trial court ruled that the admissions would be admissible for purposes of a post-trial "prove up" hearing as to the defaulting defendants. The trial court confirmed it would not accord any weight to the substance of the admissions as to any defendants other than Tahoe Equities and Russell. Thus, when the Nunez plaintiffs called at trial a witness relevant to the tort claims against defendants Tahoe Equities and Russell alone, the parties stipulated the Nicholson defendants and Gill defendants did not need to object to any testimony as the witness's testimony did not pertain to claims asserted against them.

On June 24, 2019, well after the trial had concluded on February 9, 2018, the statement of decision had been issued on June 25, 2018, and the instant appeal had been initiated in September 2018, the trial court granted the Nunez plaintiffs' motion for judgment after trial against defendants Tahoe Equities and Russell only. Regarding the intentional tort claims alleging interference with Nunez's attempt to sell the property to a third party, the trial court granted restitution in the amount of $1,600,000. The restitution order did not concern the Nicholson defendants and the Gill defendants.

## DISCUSSION

## I.      The Nicholson Defendants Acquired Ownership of the Disputed Equipment as Part of Acquiring Title to the Gateway Property in the Trustee's Sale

The trial court found that "the gas station, the car wash, the mini mart, and the taqueria, and all of the equipment necessary for their operation, are fixtures that run with

---

**12** As noted, Wells Fargo did not participate in the trial because the trial court had granted a motion to compel arbitration on the claims asserted against it.

the land and rightfully passed to the Nicholson Defendants with the foreclosure sale," and, upon the subsequent resale of the Gateway Property, to the Gill defendants. The Nunez plaintiffs challenge the trial court's determination. We agree with the trial court and affirm its ruling in this regard.

## A. Background –Trial Court's Determination

The trial court found: "Here, the La Plaza business housed a gas station, car wash, mini mart, and taqueria, as part of its operations before the Plaintiffs lost the La Plaza business in foreclosure. The gas station and car wash consisted of brick and mortar buildings, concrete slabs, underground water and fuel tanks, signage, canopy, gas dispensers, pumps, hoses, and electrical and water systems that were interconnected, affixed to the ground, and necessary for La Plaza's business operations. Similarly, the mini mart and taqueria consisted of buildings, kitchen appliances, cash registers, and other equipment necessary for La Plaza's business operations. All of this business equipment constituted fixtures of the realty."

The trial court explained: "As indicated above, La Plaza was a business development and all equipment used by the Plaintiffs on the property was necessary to the operation of La Plaza's various businesses. Taking away the sumps, pumps, hoses, tracks, brushes, or plumbing and electrical connections from the car wash, for example, would render the car wash inoperable to wash cars. Removing the gas tanks, dispensers, and pumps from the gas station, for example, would render the gas station inoperable for selling gas. Removing the stove, hood, and other kitchen equipment from the taqueria would render the taqueria inoperable for cooking, storing, and selling food items. Removing the cold storage, shelving, counter, and cash register, for example, from the mini mart would disable it. Removing the foregoing equipment would obviously render La Plaza and its various facilities unusable for their customary business practices. Moreover, it would devalue La Plaza's utility as security for the mortgage under which

21.

Plaintiffs defaulted. Accordingly, because the equipment Plaintiffs claim as personal property was annexed to the realty and adapted to the purposes for which the realty served – a gas station, car wash, mini mart, and taqueria – such equipment constitutes appurtenant business fixtures, no longer personal property."

The court further found: "Here, long before the Plaintiffs came into financial difficulties, they borrowed substantial monies with the intent of improving the land they owned. Their primary goal was to create a 'one stop shop' wherein a customer could eat, pick up groceries, get their car washed, and fueled up with gas. The value to the land was specifically tied to the improvements located thereon. Further, the value to any one building/operation (gas station, car wash, mini mart, or taqueria) was tied directly to the existence of the others. For example, the car wash admittedly has enhanced value so long as it is paired with a gas station. That was the intention of the Plaintiffs. [¶] The investment made by the Plaintiffs was not in the vacant land they purchased but in the improvements they made."

The court concluded: "The Court, taking into consideration the Property, the manner in which the equipment and other items of personal property were affixed to the Property, and the apparent intention of the parties at the time of their installation, finds that the gas station, the car wash, the mini mart, and the taqueria, and all of the equipment necessary for their operation, are fixtures that run with the land and rightfully passed to the Nicholson Defendants with the foreclosure sale."

B.     Analysis

Here, the Gateway Property was sold to the Nicholson defendants in a nonjudicial foreclosure sale, and the Nicholson defendants then sold the property to the Gill defendants. The Nunez plaintiffs filed the instant action but did not assert any claim for wrongful foreclosure; rather, their claims are based on the theory that the equipment and chattels on the property were personal property that belonged to them and not fixtures

22.

that ran with the land and passed to the Nicholson defendants in the foreclosure sale. We agree with the trial court that the equipment and chattels comprising the La Plaza business development were fixtures and no longer personal property.

Property is classified as either "real" or "personal." (Civ. Code, § 657.) "Every kind of property that is not real is personal." (Civ. Code, § 663.) In addition, " '[t]he law relating to fixtures recognizes that under certain circumstances personal property becomes a part and parcel of real property and thereafter assumes the status of real property.' " (*Escondido Union School Dist. v. Casa Suenos De Oro, Inc*. (2005) 129 Cal.App.4th 944, 965; *R. Barcroft & Sons Co. v. Cullen* (1933) 217 Cal. 708, 711 (*Cullen*) ["Generally, fixtures are those things which are so attached to the realty as to be considered in law a part thereof."]; 13 Witkin, Summary of Cal. Law (11th ed. 2021), Personal Property, § 111 ["A fixture is a thing, originally personal property, but later affixed or annexed to realty, so that it is considered real property."]; *Merritt v. Judd* (1859) 14 Cal. 59, 72 ["There is no doubt, that, under a general deed of mortgage, or bargain and sale, the fixtures pass as a part of the freehold."].)

Thus, real property includes "[l]and," "[t]hat which is affixed to land," "[t]hat which is incidental or appurtenant to land," and "[t]hat which is immovable by law." (Civ. Code, § 658.) "A thing is deemed to be affixed to the land when it is attached to it by roots, as in the case of trees, vines, or shrubs; or imbedded in it, as in the case of walls; or permanently resting upon it, as in the case of buildings; or permanently attached to what is thus permanent, as by means of cement, plaster, nails, bolts, or screws." (Civ. Code, § 660.)

Under modern theories, the manner in which a given item is affixed to the land is not the sole or most important test for determining whether the item is fixture. (*Cornell v. Sennes* (1971) 18 Cal.App.3d 126, 132 (*Cornell*).) Rather, in determining whether a given item is affixed to the land or a fixture, a trial court must consider (1) the manner in

23.

which the item is annexed to the underlying realty; (2) its adaptability to the use and purpose for which the realty is used; and (3) the intention with which the annexation was made. (*Rinaldi v. Goller* (1957) 48 Cal.2d 276, 279 (*Rinaldi*).) " 'Of these [factors], intention is the most significant, but the manner of annexation and the use to which the property is put are relevant in determining such intention.' " (*Cornell*, *supra*, at p. 132; *Rinaldi*, *supra*, at p. 280 [" 'the character of the annexation to the land or other realty and the use made of the property are important considerations, but in most cases are subsidiarily employed for the purpose of testing the intention of the parties.' "].)

 *Breyfogle v. Tighe* (1922) 58 Cal.App. 301, 305 (*Breyfogle*) addresses the three-part test in depth. *Breyfogle* states: " 'In determining whether personal property attached to land becomes a part of the realty there are "three general tests which may be applied, … first, annexation to the realty, either actual or constructive; second, adaptation or application to the use or purpose to which that part of the realty to which it is connected is appropriated; and, third, intention to make the article a permanent accession to the freehold." ' " (*Ibid.*) *Breyfogle* further observes: " 'The test of intention is to be given a broad and comprehensive signification. It does not merely imply the secret action of the mind of the owner of the property, nor need it be expressed in words, but it is to be inferred from the nature of the article affixed, the relation and situation of the party making the annexation, the structure and mode of annexation, and the purpose or use for which the annexation has been made; which, obviously, suggests that the other tests are really part of this comprehensive test of intention, and that they derive their chief value as conspicuous evidence of such intention.' " (*Ibid.*)

 Furthermore, " '[a] widely accepted view is that the united application of all three tests is required, but it is evident that even this will not suffice in all situations and that there are other [potentially applicable] factors, including the relationship of the claiming parties, the relative difficulty of removal, the nature of the article annexed, and whether

24.

the fact of annexation is open and apparent.' " (*Cornell*, *supra*, .) To the extent the relationship between the parties to the controversy is considered, "as between vendor and vendee, or mortgagor and mortgagee, the rule in reference to fixtures is construed most strongly in favor of the vendee or mortgagee." (*Cullen*, *supra*, 217 Cal. at p. 711.)

A trial court's determination as to whether disputed property constitutes fixtures or personalty is a factual one that is reviewed for substantial evidence. (*Plough v. Petersen* (1956) 140 Cal.App.2d 595 [whether an item is "a fixture or personalty is a question of fact and various factors must be considered, such as the manner of its annexation, its adaptability to the purpose for which the realty is used, and the intention of the party making the annexation"]; *Larkin v. Cowert* (1968) 263 Cal.App.2d 27, 30, 31 [where question of status of item as a fixture or personalty is properly subject to reasonable difference of opinion, the trial court's decision is binding]; *Cullen*, *supra*, 217 Cal. at p. 711 [whether an item or article is a fixture is a question of fact to be determined upon the evidence in the particular case]; *Alameda County v. Tieslau* (1919) 44 Cal.App.332, 339 [a reviewing court can set aside trial court's factual finding only when it is not supported by substantial evidence].) "It is only if one inference can be properly drawn from the evidence that the question is one of law." (*State ex rel. Department of Water Resources v. Superior Court of Butte County* (1962) 208 Cal.App.2d 659, 665; *Gaston v. Hisashi Tsuruda* (1935) 5 Cal.App.2d 639, 642.)

Here, much of the disputed equipment was physically affixed to the land (for example, gas station equipment), or annexed to buildings or structures that were themselves affixed to the land and were therefore permanent, with the equipment (for example, carwash equipment, mini mart shelves, taqueria counters and appliances) and structures forming a complete unit. Thus, much of the equipment was either annexed or constructively annexed to the land. Stated differently, the nature of the equipment and its manner of installation indicated that it was intended to run with the land. (See *United*

25.

*Pacific Ins. Co. v. Cann* (1954) 129 Cal.App.2d 272, 275 [equipment at ship building operation that was not physically affixed to the land nonetheless constituted fixtures because it was necessary for the functioning of, and formed a unit with, other permanent structures].)

In addition, the disputed equipment and inventory on the premises was clearly adapted or applied to the purposes to which the realty was appropriated, namely, a "one stop shop" that included a gas station, carwash, mini mart, and taqueria. (*San Diego T. & S. Bank v. County of San Diego* (1940) 16 Cal.2d 142, 150-152 [bank vault door was held to be a fixture partly because it was physically integrated and partly because it was functionally integrated with the building; as to the latter factor, the court highlighted the point that a vault is essential to a bank and a door is essential to a vault].) In other words, the equipment and inventory was essential for the functioning of the business development on the Gateway Property indicating that the equipment was intended to run with the land and be included with any conveyance of the realty.

Most significantly, Nunez testified that he developed the Gateway Property as a "one stop shop," where customers could fuel up, get their cars washed, shop for groceries, and get prepared food to eat on the spot or take away. He envisioned his investments in, and development of, the Gateway Property as creating an enduring asset that he would pass on to his children, one that would supply the next generation of his family with an income stream for the long term. Reflecting his view that the real property and business developments were part and parcel of the La Plaza operation, when Nunez obtained the $1.23 million loan from Wells Fargo, he collateralized both the real property and all equipment and inventory on the property as security for the loan (as evidenced in the security agreements that Nunez and Joy Nunez, and La Plaza, respectively, signed with Wells Fargo, in relation to the loan transaction).

When Nunez was unable to make payments on the loan, he attempted to sell the property and the business development built thereon—gas station, carwash, mini mart, taqueria, and all associated equipment and inventory—as a whole, to third party buyers. Nunez's tentative agreement to sell the Gateway Property to third party buyers contemplated the sale of the land along with all the equipment and inventory located thereon, as a unitary asset. When Nunez was notified by Wells Fargo that it would not finance the sale of the property to the third-party buyers proposed by Nunez, it became clear that a nonjudicial foreclose sale of the property would follow. Nunez did not assert, at that time, that the disputed equipment and inventory was personalty and was not subject to any foreclosure sale; nor did he put Wells Fargo on notice as to any putative right to extract such items from the property. Indeed, with a nonjudicial foreclosure sale looming, Nunez had every opportunity, over several months, to arrange to remove the disputed equipment and inventory from the Gateway Property to the extent he viewed such items as personalty that was not subject to the foreclosure sale. Nunez, however, did not take any steps during that period to lay claim to, or to take possession of, any of the equipment or inventory on the premises.

Of course, Nunez, or more correctly entities he owned and controlled (e.g., La Plaza Mini Mart, Inc. and H & N Accountancy Corporation) had guaranteed the loan on which he had defaulted and would be liable for any remaining deficiency balance after the foreclosure sale of the property. Nunez understood the value of the Gateway Property lay in the marriage of the business development (including all associated equipment and inventory) with the land. Given the commercial guarantees executed by, inter alia, La Plaza Mini Mart, Inc. and H & N Accountancy Corporation, Nunez ultimately benefitted from the fact that the foreclosure sale encompassed both the land and the business development with its associated equipment and inventory.

Nunez's testimony and actions show that the La Plaza business development and the related equipment and inventory were part and parcel of the Gateway Property – with the value of the property residing in the nature of the development as a "one stop shop" for the public to buy fuel, utilize the carwash, shop at the mini mart, and get a meal at the taqueria. The record amply discloses substantial evidence supporting the trial court's conclusion that the disputed equipment and inventory represented a permanent accession to the freehold under the law, whereby such equipment and inventory were fixtures that were included with any conveyance or transfer of title of the realty.[13]

As for the automatic carwash equipment, the Nunez plaintiffs argue that since this equipment was leased, it was not a fixture that ran with the land. The trial court rejected this argument. The trial court noted that "[n]o evidence was presented at the trial which would suggest that the [Nicholson defendants] were made aware of any leases, or other private agreements, which would give advance notice to them that any of the items of personal property claimed by the Plaintiffs were anything other than fixtures appurtenant to the real property."

Citing appropriate authorities, the trial court observed, " 'where, as here, [at issue are] the rights of a person … who is without actual or constructive notice concerning the intent of the parties responsible for annexing the personalty to the realty, the question is not so much the intent of such parties as the apparent intent as would reasonably appear to such third person.' " (See, e.g., *Kruse Metals Mfg. Co. v. Utility Trailer Mfg. Co.* (1962) 206 Cal.App.2d 176, 183, quoting *Hammond Lumber Co. v. Gordon* (1927) 84 Cal.App. 701, 705; see also *Cornell*, *supra*, 18 Cal.App.3d at p. 133 ["[I]t would be

---

**13** The Nunez plaintiffs contend that, to the extent the equipment was part of the business, the intention of the La Plaza corporate entity should control, rather than that of Nunez himself. This assertion does not account for the reality that, as the owner and president of La Plaza Mini Mart, Inc., Nunez controlled the corporate entity and operated the business.

legally possible, in the absence of an agreement to the contrary, to reach a conclusion that as between a conditional vendor of an affixed chattel and the tenant-purchaser, the article is to be considered as personalty, but as between the same vendor and the owner of the realty, the same equipment, attached in the same manner, would be deemed to be a part of the realty."].) Daryl Nicholson testified at trial that he was not aware at the time of the foreclosure sale that Wells Fargo Financing held a lease on the carwash at the Gateway Property. The trial court concluded that Nicholson was "protected from the hidden intentions of the Plaintiffs." The trial court's determination is supported by substantial evidence.

## II. Trial Court Properly Denied the Nunez Plaintiffs' Motion to Amend the Operative Complaint to Add a Real Property Claim, During the Trial

After the Nunez plaintiffs had finished presenting, at trial, their case in chief and had rested, they brought a motion to amend the second amended complaint to add an entirely new, real property cause of action, specifically, quiet title to real property. The Nunez plaintiffs contend on appeal that the trial court erred in denying their motion to amend to add a quiet-title-to-real-property cause of action. We disagree and affirm.

We review a trial court's denial of a motion to amend pleadings, for abuse of discretion, and the appellant has the burden of establishing that the court abused its discretion. (*Emerald Bay Community Assn. v. Golden Eagle Ins. Corp*. (2005) 130 Cal.App.4th 1078, 1097.) "Generally, 'the trial court has wide discretion in determining whether to allow the amendment, but the appropriate exercise of that discretion requires the trial court to consider a number of factors: "*including the conduct of the moving party and the belated presentation of the amendment*." ' " (*Ibid*.) " ' "The law is well settled that a long deferred presentation of the proposed amendment without a showing of excuse for the delay is itself a significant factor to uphold the trial court's denial of the amendment. [Citation.]" [Citation.] "The law is also clear that even if a good

29.

amendment is proposed in proper form, unwarranted delay in presenting it may—of itself—be a valid reason for denial." ' " (*Ibid*.)

In the papers supporting their motion to amend filed in the trial court, the Nunez plaintiffs explained they had recently come across a case, *Bank of America v. La Jolla Group II* (2005) 129 Cal.App.4th 706 (*La Jolla*), which alerted them to the feasibility of bringing a quiet-title-to-real-property cause of action. The trial court denied the Nunez plaintiffs' motion to amend to add a new cause of action, quiet title to real property, noting that it was "untimely." The court observed: "The facts at least that would have been the basis of such a motion or amended complaint were known literally years before now and certainly the motion should have been brought prior to trial. And it would certainly change the nature of the evidence to be presented at trial by the parties and, as pointed out by Nicholson, it certainly would have changed the entire direction of discovery that may have occurred."

The Nicholson defendants contend that the belated discovery of *La Jolla*, a 2005 case, is not an appropriate excuse for the Nunez plaintiffs' unwarranted delay in seeking to amend the complaint. The Nicholson defendants argue: "*La Jolla* issued in May 2005, more than *twelve years* prior to [the] motion, *six years* prior to the filing of the Initial Complaint, and *five years* prior to the facts which would give rise to [the real property] claim. [The Nunez plaintiffs'] delinquent discovery of the *La Jolla* opinion does not excuse their delay." The Nicholson defendants cite, in support of their argument, *P&D Consultants, Inc. v. City of Carlsbad* (2010) 190 Cal.App.4th 1332, which held the plaintiff could not rely on its belated discovery of relevant case authority to justify seeking to amend the complaint on the eve of trial. (*Id*. at p. 1345.)

The Nicholson defendants' argument is persuasive. The Nunez plaintiffs offered no explanation to the trial court for their belated discovery of *La Jolla*. We detect no abuse of discretion in the trial court's denial—on grounds of unreasonable delay—of the

motion to amend the second amended complaint, to add a quiet-title-to-real-property cause of action.

### III. The Trial Court Properly Declined to Undo the Transfer of Title to the Real Property on the Basis of the Alleged Invalidity of the Foreclosure Sale, as the Issue was not Properly Before the Court (There was no Claim for Wrongful Foreclosure or Quiet Title to Real Property in the Operative Complaint)

The Nunez plaintiffs raise a plethora of contentions in arguing that the foreclosure sale was invalid, and the trial court's judgment should be reversed on this basis. The primary theories they raise in this regard are that: (1) the assignment of the deed of trust to the Nicholson defendants was void because the Nicholson defendants did not take possession of the promissory note, precluding them from enforcing the debt on the property;[14] (2) the debt owed on the property was extinguished or canceled by the judgment obtained, after the trial, against Tahoe Equities and Richard Russell; and (3) the trustee committed a number of procedural errors regarding notice requirements and the foreclosure sale process.

The Nunez plaintiffs' request to this court to invalidate the foreclosure sale necessarily fails because the Nunez plaintiffs did not assert claims for wrongful foreclosure and quiet title to real property in this action and a request for such relief, that is, invalidation of the trustee's sale and cancelation of the transfer of real property, was not properly before the trial court. (See *State Compensation Ins. Fund v. Maloney* (1953) 121 Cal.App.2d 33, 42 (*Maloney*) ["It is fundamental that a party on appeal cannot successfully complain because the trial court failed to do something which it was not

---

**14** In relation to their claim that the Nicholson defendants did not possess the promissory note, the Nunez plaintiffs further contend that the Nicholson defendants did not receive delivery of the original deed of trust document, the assignment of the deed of trust is void, the promissory note was not endorsed, the name of the assignee to the deed of trust was not noted in proper form, and the original promissory note was not deposited with trustee as called for in the deed of trust.

asked to do and which was not before the court."].) A judgment cannot be reversed on appeal based on the asserted failure of the trial court to give relief that was "not embraced in the pleadings and which it was not asked to give." (*Id.* at pp. 41, 42 [rejecting argument on appeal that trial court erred by not overturning an administrative ruling because "[n]owhere in the complaint … is there any mention of [the ruling]"].)

The Nunez plaintiffs rely on cases in which the parties actually pursued a cause of action for recission of title to real property received pursuant to a nonjudicial foreclosure sale. (See, e.g., *Sciarratta v. U.S. Bank National Assn.* (2016) 247 Cal.App.4th 552, 558 [action for wrongful foreclosure and quiet title to real property]; *Yvanova v. New Century Mortgage Corp.* (2016) 62 Cal.4th 919, 928-929 [issue was whether a borrower had standing to sue for wrongful foreclosure]; *Glaski v. Bank of America* (2013) 218 Cal.App.4th 1079, 1100-1101 [action alleged quiet title to real property and wrongful foreclosure]; *Dimock v. Emerald Properties* (2000) 81 Cal.App.4th 868, 877-878 [action involved claims for declaratory and injunctive relief, quiet title to real property, and damages]; *La Jolla*, *supra*, 129 Cal.App.4th at p. 709 [action for cancelation of deed that purchaser received following nonjudicial foreclosure sale].)

In contrast to the claims at issue in the cases they have cited, here the Nunez plaintiffs attempted to amend the relevant complaint to add a wrongful foreclosure cause of action, but the trial court properly denied that request. Subsequently, the Nunez plaintiffs sought to amend the complaint to add a claim for quiet title to real property; the trial court also properly denied this request. The Nunez plaintiffs' instant theories as to the invalidity of the foreclosure sale are precluded by the operative complaint, wherein they did not allege *any of the facts* they now contend invalidate the foreclosure sale, nor did they seek such relief.

The trial court recognized that this case properly implicated only personal property interests and not real property interests. In seeking to amend the second amended

complaint to add a claim for quiet title to real property after they had rested their case, the Nunez plaintiffs explained they had not realized the feasibility of bringing such a claim until they conducted research for an opposition to a motion for judgment filed by the Nicholson defendants. The trial court denied the motion to amend, noting that had the action encompassed real property interests, "it certainly would have changed the entire direction of discovery that may have occurred."

The Nicholson defendants' counsel also pointed out in closing argument that, to the extent the Nunez plaintiffs were arguing points such as, "these Promissory Notes were not perfected" and "originals [were] not deposited," their arguments addressed "interpretation of documents or allegations through causes of actions that don't even exist here," as in "wrongful foreclosure," which was "[n]ot a claim here." Since the pleadings did not encompass the relief of invalidating the foreclosure sale and undoing the transfer of real property, we cannot fault the trial court for not granting such relief. (See *Maloney*, *supra*, 121 Cal.App.2d at p. 42.) In its statement of decision, the trial court emphasized: "Absent this Court setting aside the Trustee's sale of the real property, the sale of the real property on January 12, 2011, passed with it title to all of the fixtures appurtenant thereto." The court did not set aside the trustee's sale, as the Nunez plaintiffs' arguments in this vein were largely outside the scope of the operative complaint, which did not seek such relief. We affirm the trial court's ruling.

In light of our conclusion, we need not address any remaining, miscellaneous contentions in the Nunez plaintiffs' briefing. We note that many points scattered in the Nunez plaintiffs' briefing are inappropriately raised and thereby waived, as they are unsupported by reasoned argument and citation to applicable legal authorities, with only sporadic and inadequate citation to the record. (See *Benach v. County of Los Angeles*

(2007) 149 Cal.App.4th 836, 852 [when an appellant asserts a point, "but fails to support it with reasoned argument and citations to authority," we treat the point as waived].)[15]

## DISPOSITION

The judgment is affirmed.  Respondents are awarded their costs on appeal.

SMITH, J.

WE CONCUR:

HILL, P. J.

SNAUFFER, J.

---

[15]     At oral argument in this matter, Ravinderjit Gill appeared pro per on behalf of the Gill defendants. Nunez made a general objection to Gill's argument on grounds that Gill had referred to matters outside the record on appeal.  In resolving this case, we have not considered Gill's references to extra-record matters or any parts of his argument that were outside the scope of the issues on appeal.